Filed 11/20/25  In re M.B. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.B., a Person Coming Under the Juvenile Court Law. | B340235 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 23CCJP03702B) |
| Plaintiff and Respondent, | |
| v. | |
| TANYA V., | |
| Defendant and Appellant, | |
| MARTIN B., | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner. Affirmed.

Cindy J. Shin, under appointment by the Court of Appeal, for Appellant Mother.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Respondent Father.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Tanya V. (mother) appeals from a dependency court judgment awarding mother and Martin B. (father) joint legal custody of M.B. (child).  Mother contends that the court abused its discretion in awarding joint custody because (1) the court improperly presumed that joint legal custody was favored over sole custody; (2) father had not complied with his case plan; and (3) the court failed to inquire about a criminal protective order that may have been in effect and that could have affected the court's custody ruling.  We conclude the juvenile court applied the correct "child's best interest" legal standard and did not abuse its discretion in granting joint legal custody to the parents.  Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. The Domestic Violence Incident

On August 27, 2023, law enforcement arrested father and charged him with inflicting corporal injury to, and false imprisonment of, mother.  According to the police report, mother was about to leave the house with child when father put her in a headlock, slammed her to the ground, and began assaulting her.  Law enforcement observed redness on mother's neck, a scratch on mother's forearm, and a scratch on father's face.  Nine-month-old child, who was present in a walker, was not harmed.

Two days later, the criminal court issued a pretrial Criminal Protective Order (CPO) restraining father from certain contact with mother.[1]  The CPO included a no-contact order and a stay-away order from mother, her house, and her vehicle.  The CPO did not include child.

**2.  The Department's Initial Investigation**

Over the next two months, the Los Angeles County Department of Children and Family Services (department) investigated father's domestic violence.[2]  Mother reported additional information about the incident, including that father had punched her in the face "a few times."  Father denied choking and hitting mother, claiming his conduct was more of a "bear hug," but acknowledged his desire to learn from this incident.

Mother told the department this was the first time one of their arguments had led to physical violence.  She and father had been together for two years.  Father had helped her stay sober, supported her financially, and was "a good person and a good

---

[1]     The CPO was a pretrial order issued in the criminal court pending resolution of those proceedings.  (Pen. Code, § 136.2, subd. (a).)  The form states the "order remains in effect until further court order" and courts "must" use another specified court form to terminate the order; the form also states the order is only "valid as long as the court has jurisdiction over the case" and courts "should" use the specified form to terminate it.  The record does not contain a termination order.

The CPO differs from an earlier Emergency Protective Order restraining father from both mother and child.  That order expired on September 1, 2023, five days after father's arrest.

[2]     Both the father and the department are respondents in this appeal; each filed a respondent's brief.

3

father." Although they were now separated, mother allowed father to visit child at her home during the day while she was at work. Father coordinated visitation with child's maternal grandmother, who also monitored the visits. Mother had "no concerns" about father's visitation with child but pointed out that maternal grandmother was always present. The social worker reported that mother's sister said that "she had no concerns for mother or father or the children in their care."

Father advised the department that the CPO remained in place until his upcoming criminal court hearing in October. Mother told the department she was unaware of the CPO's existence until the social worker mentioned it to her. The record does not tell us the exact disposition of the criminal case, but by August 23, 2023, father had been released on probation.

The department examined mother's and father's criminal history during approximately the past 10 years, as well as mother's prior referral from the department. Mother had four convictions, the most serious of which were drug-related, and had been arrested several times. Father also had several arrests, two of which resulted in convictions, one for misdemeanor assault with a deadly weapon (not a firearm) and the other for driving under the influence.

In 2013, mother was a party to separate dependency proceedings in which her family reunification services pertaining to child's half-sibling were terminated because mother had stopped complying with her court-ordered programs. Father had no prior cases from the department.

In its written report to the court, the social worker opined that father had "not taken accountability for his actions," was minimally cooperative with the department, and repeatedly

violated the CPO by visiting child at mother's home. The department requested that child be removed from father and released to mother.

### 3. The Dependency Petition

On October 27, 2023, the department filed a dependency petition alleging two counts: substantial risk of serious physical harm and failure to protect child.[3]  (Welf. & Inst. Code, § 300, subds. (a) & (b).)  The petition alleged mother and father had "a history of engaging in violent physical altercations in the presence of the children," and referred to the August domestic violence, father's noncompliance with the CPO by visiting child at mother's home, and mother's prior case by the department.

### 4. Initial Hearing

At the initial hearing on November 13, 2023, the juvenile court removed the child from father and released child to mother. The court ordered monitored visitation for father at a neutral location.  Mother and father "remain[ed] the holder of Educational and/or Developmental rights for the minor child."

### 5. The Department's Continued Investigation

During the next two months, the department interviewed mother and father and observed child's behavior and development during home visits.  The department reported that mother and father had been separated since the dependency case opened.

In a report dated December 18, 2023, the department stated that mother had told the department again that the August altercation was the first time an argument had turned

---

[3]     A third count against only mother alleged failure to protect child's half-sibling but was later dismissed.  We discuss it no further.

physical between her and father. She had also repeated she had no safety concerns for child with father. The report stated that "mother did not follow through with obtaining a permanent Restraining Order as previously advised."

Despite parents' separation, mother preferred to co-parent with father. Mother stated that father and child have "a bonded relationship," father is "very involved" in child's life, father visits child weekly, and he also provides financial support. Maternal grandmother monitored father's visits with child, which occurred Tuesdays through Saturdays for five hours.

Father told the department this was the first physical altercation between them but continued to deny putting mother in a headlock. Father voiced his intention to complete his domestic violence classes, acknowledged he made a mistake, and believed "those classes would help me understand better" so child would not grow up in the foster care system like father had. Father had not enrolled in domestic violence classes as of December 2023. Father said there were no restraining orders between him and mother. The department reported father was employed, he visited child weekly, and the department had no safety concerns with those visits.

The department believed father minimized the domestic violence incident, which was of particular concern because of father's criminal history. The department continued to recommend that child be declared a dependent of the court; child to reside with mother; mother to receive family maintenance services; and father to receive family enhancement services and monitored visitation.

**6. The Adjudication Hearing**

On January 10, 2024, the court adjudicated the dependency petition. Mother and the department reached a settlement by which mother would be ordered to attend a program for domestic violence victims, and the court would find mother a nonoffending party and strike from the petition the allegations against mother. There remained the two counts involving father.

Father argued that the substantial risk of physical harm count should be dismissed because the petition alleged only a single incident and the child was not in any danger. He also asked that he be allowed to attend a 26-week domestic violence program rather than one of 52 weeks.

The department objected to the reduced program but conceded it had found no evidence "of ongoing physical violence between these two parents." It nevertheless asked the court to sustain both counts given child's presence at the incident and father's violation of the CPO by visiting the child in mother's home.

The court sustained both counts against father, ordered him to complete a 26-week domestic violence program, parenting and individual counseling, and to submit to drug testing on reasonable suspicion. The court granted father a minimum of nine hours visitation per week, monitored by maternal grandmother. Mother was not to be present during visitation. The court then scheduled a further hearing for July 10, 2024.

### 7. The Department's Final Report

Prior to the July 10, 2024, hearing, the department submitted updated information about the parents' conduct over the previous six months. Mother maintained employment, cooperated with the department, and complied with her court-ordered case plan. Mother provided a certificate of completion

and progress letter for her required program. Mother was engaged with child and advocated for his needs; child was "growing in an age appropriate manner."

The department's report stated that father, on the other hand, had not made himself available. Father was noncompliant with all three court-ordered enhancement services: domestic violence support group, parenting program, and individual counseling.

As for visitation, mother had reported that maternal grandmother monitored weekly visits between father and child at a park, which went well. Maternal grandmother said father was engaged during the visits and child seemed happy.

The department recommended that the juvenile court terminate jurisdiction and enter a family law "exit order" granting mother sole physical custody, mother and father joint legal custody, and monitored visitation for father.

### 8. Final Jurisdictional Review Hearing

At the July 10, 2024, final hearing, the court admitted the department's report. No party objected to terminating dependency jurisdiction, and the hearing proceeded to argument on custody and visitation issues.

Father, child, and county counsel agreed with the department's recommendations, including for joint legal custody. Mother opposed the recommendation. Her counsel argued for sole legal custody for mother and told the court that she did not believe "these parents are going to be able to co-parent together, especially since the department is not even recommending that mother be allowed to monitor father's visits. So I don't know how they would make joint decision-making about the child." The court then asked whether a restraining order was in place,

mother's counsel stated she "would have to check," to which the court responded, "I don't think so."[4]

Father's counsel submitted on the department's recommendation, stating "[t]he visits, as far as I know, have all gone well. And what wasn't included in the latest report – father just provided me with – he's already completed 23 of the 26-week domestic violence batterers program. He'll be done with it very shortly." The court responded that a visitation order should be included with the custody order, asked what else father was ordered to do, and stated that all court-ordered programs "should be included on the [visitation order] so you can go to family law court and ask to have the visitation or the [juvenile custody order] modified."[5]

The court found department supervision of child no longer necessary, terminated dependency jurisdiction, granted mother sole physical custody, granted joint legal custody to mother and father over mother's objection, and stated "it's very important

---

[4]     By using the phrase "restraining order," we understand that the court was referring to the CPO, not the already expired emergency protective order discussed *ante*.

[5]     It is unclear whether the court credited counsel's hearsay statements regarding father's progress in the domestic violence program. Mother did not object or refute the representation. The minute order for the July 10, 2024, hearing states, in part: "Parents are in compliance with case plan." In contrast, the court's Parentage-Findings and Judgment, filed the same day, included as part of its "visitation order" two boxes checked with an "x" indicating father "has not completed" and "has not made substantial progress in the . . . court-ordered programs." We consider father's case plan participation in the Discussion section, *post*.

9

that parents find a way of co-parenting together peacefully and putting the child first, and that father remain a part of this child's life and the decision-making of the child's educational, medical, and mental health needs." The court ordered a minimum of nine hours monitored supervision for father. Father's visitation was not to be in mother's home, and mother was not to be the monitor.

Mother timely appealed.

## DISCUSSION

We find no error in the court's joint legal custody order. Mother proffered no evidence that she and father would be unable to "share the right and the responsibility to make the decisions relating to the health, education, and welfare" of child (Fam. Code, § 3003), or that joint custody would not be in the child's best interests for any other reason. The evidence was essentially uncontradicted that father maintained consistent visitation with child, had bonded well with child, and provided financial support to mother. Mother had previously expressed a desire to co-parent with father and considered him a "good person." Contrary unsupported legal arguments and innuendos made on appeal are not evidence. As we discuss below, we also find mother's other arguments unpersuasive and conclude the juvenile court did not abuse its discretion in awarding the parents joint legal custody.

## I.    Legal Standard

When a juvenile court terminates dependency jurisdiction over a child, it may also issue "an order determining the custody of, or visitation with, the child." (Welf. & Inst. Code, § 362.4, subd. (a).) This is typically referred to as an "exit order." (See *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1156-1158.)

10

Custody has two components: physical and legal. Physical custody means the child resides with and is under the supervision of one or both parents. (Fam. Code, §§ 3004 [joint physical], 3007 [sole physical].) Legal custody refers to whether one parent holds, or both share, the decision-making authority "relating to the health, education, and welfare of a child." (Fam. Code, § 3003) [joint legal], 3006 [sole legal].) Here, no party contests that part of the juvenile court's order giving mother sole physical custody. Given this limited challenge to the exit orders, we address only joint legal custody.

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, quoting *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.'" (*In re J.M.* (2023) 89 Cal.App.5th 95, 112, quoting *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712.) With these formative principles in mind, the juvenile court has broad discretion to make custody and visitation orders when it terminates jurisdiction in a dependency case. (*In re J.M.,* at pp. 112–113.)

We review the juvenile court's exit orders for an abuse of that discretion. (*In re Maya L.* (2014) 232 Cal.App.4th 81, 102.) Abuse of discretion occurs "if there is no reasonable basis on

which [the court] could conclude that its decision advanced the best interests of the child" or the court "applies improper criteria or makes incorrect legal assumptions." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497, italics omitted.) " ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re N.M.* (2023) 88 Cal.App.5th 1090, 1094, quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

II.     **The Juvenile Court Acted Within Its Discretion in Awarding Joint Legal Custody**

In the face of the substantial evidence supporting the juvenile court's ruling, mother presents three arguments on appeal, none of which convinces us that the juvenile court abused its discretion.

   **A.  The presumption argument.**

Mother first claims that the court, instead of putting the evidence in support of sole custody on equal footing with the evidence favoring joint custody, improperly applied a presumption in favor of joint custody and ruled accordingly.

We agree with mother that joint custody is not the preferred or presumed form of custody. We have earlier stated this rule: " '[T]he juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' " (*In re J.M., supra,* 89 Cal.App.5th at p. 112.)

Mother argues on appeal that the court ignored this principle and followed a supposed presumption. "The court

12

mistakenly seemed to rely on a general presumption favoring the benefits of joint custody, without adequately considering the specific, documented circumstances of this family."

Nothing the court said during the July 10, 2024, hearing at which the court terminated jurisdiction and issued its exit orders remotely suggests the court was relying on any presumption of joint legal custody. The court voiced neither a "presumption" nor a "preference"; nor did it speak other words that might have suggested the court was implicitly applying a presumption of joint custody. The court's entire statement on the subject was: "The court's order terminating jurisdiction is stayed pending receipt of the family law order that will be prepared by [mother's counsel] and submitted on – giving mother sole physical, joint legal. . . . It's very important that parents find[ ] a way of co-parenting together peacefully and putting the child first, and that father remain a part of this child's life and the decision-making of the child's educational, medical, and mental health needs."

We find that nothing in the record supports mother's argument that the court presumed joint legal custody was in the child's best interest rather than assessed the child's interest based on all the evidence before it.

### B. The case plan argument.

Mother argues the court abused its discretion in awarding joint legal custody because father had not completed his case plan. The court had ordered that father complete 26 weeks of domestic violence training plus parenting and individual counseling.

Mother's argument fails because, among other things, the record does not support her position. As the appellant, mother has the burden of providing a record sufficient to carry her

13

contentions on appeal.  "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct, and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment."  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)

The record shows that father was ordered to complete a 26-week domestic violence program and other counselling.  Whether he completed any or all of these programs is not so clear.  Prior to the July 10, 2024, termination hearing, the department had submitted a report that father was noncompliant with his court-ordered enhancement services.  Nevertheless, the department recommended that dependency proceedings be terminated with mother awarded physical custody and both parents to share legal custody.

No one testified at the hearing, and the only written material submitted was the department's report.  While the department's report mentioned father's noncompliance with the case plan, the question of compliance came up in a most indirect way at the hearing, if it was suggested at all.

The court heard briefly from all counsel – the hearing is recorded in six pages of reporter's transcript.  The department submitted on its previously filed recommendation.  Next, mother's counsel voiced her opposition to joint legal custody.  In her short statement to the court, she said nothing about any noncompliance with the case plan.  Her complete argument was: "I know the recommendation is for joint legal custody.  However, given the severe domestic violence allegations that were sustained by this court, I'm asking for sole legal custody.  I don't

14

think, given the domestic violence history, that these parents are going to be able to co-parent together, especially since the department is not even recommending that mother be allowed to monitor father's visits. So I don't know how they could make joint decision-making about the child and – about the child [M.B.]."

The court then inquired whether a protective order was in effect, to which mother's counsel said, "I would have to check," and the court replied, "I don't think so."

Next, father's counsel addressed the court. He submitted on the department's report and then said, "The visits, as far as I know, have all gone well and what wasn't included in the latest report – father just provided me with – he's already completed 23 of the 26-week domestic violence batterers program. He'll be done with it very shortly."

Mother's counsel said nothing in response to the remarks by father's counsel. She made no evidentiary objection to counsel's statement or challenged the information in any way. The court said nothing in response to this exchange except that she was reminded that the case plan information would have to be included in form JV-206, which was eventually attached to the final judgment.

Although nothing was said about father's compliance with the case plan during the July 10, 2024, hearing, the minute order of that hearing did, specifically: "Court finds notice proper. Parents are in compliance with case plan." However, the final judgment signed by the court three weeks later, contains two checked boxes that state that father "has not completed his case plan" and "has not made substantial progress in his case plan."

At best, the record is unclear whether the court made findings on the issue and whether it took into account the

15

statement by father's counsel that father had completed 23 sessions of his 26-week domestic violence program. To the extent mother now claims the court erred in considering partial completion of the plan because the information on father's participation lacked foundation or on other evidentiary grounds, she has waived that argument by failing to object in the trial court. (*Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1024 [father's evidentiary objections waived because not raised in trial court].)

Mother's argument fails for another reason. Completion of a case plan is not the sine qua non for an award of joint legal custody to a noncompliant parent. Mother has cited no authority for this position, and we observe that such a rule would be inconsistent with the wide latitude afforded the juvenile court in fashioning exit orders. (See *In re J.M.*, *supra,* 89 Cal.App.5th at p. 112.) Mother essentially asks us to "penalize" father for his failure to comply with his case plan. We decline to do so. Juvenile court orders "must . . . not reward or punish one parent or another for failing to comply with the case plan." (*In re N.M., supra,* 88 Cal.App.5th at p. 1095 [reversing an award of sole physical custody when appellant nonoffending parent had not completed his case plan].)[6]

Rather than applying mother's proposed "no plan, no legal custody" rule, we find the record shows that the juvenile court was mindful of the important parenting choices concerning child's "health, education, and welfare" (Fam. Code, § 3003) that would

---

[6] The trial court in issuing the order that the appellate court reversed in *In re N.M* was explicit: " 'It's not appropriate to reward a parent who does nothing in this court, *so* I'm not going to make it joint legal.' " (*In re N.M.*, *supra*, 88 Cal.App.5th at p. 1095.)

16

have to be made continuously as child aged. And that father's role would be important. So far, father had regularly visited with child. Neither mother nor the department objected to visitation, and the maternal grandmother consistently described the visits positively. Father had bonded with child. Mother had no safety concerns about father spending time with child, and described father as "very involved" in child's life. At times, she even expressed to the department a desire to co-parent with father.

The trial court could have reasonably found on this record that father's participation with mother in decisions affecting the health, education and welfare of the child was in child's best interests.

We find no abuse of discretion

## C. The protective order argument.

In her opening brief, mother argues: "Further inquiry was necessary concerning the father's violation of criminal protective order." In her reply brief to the department, she summarized her argument this way: "The court's failure to investigate or make a definitive finding [about the protective order against father] undermined the legal and factual basis for its custody determination." Her authority: "California Rule of Court 5.445(b)(1)(B) encourages courts 'hearing cases involving child custody and visitation to take every action practicable to ensure that they are aware of the existence of any criminal court protective orders involving the parties to the action currently before them.' "[7] She does not explain how "encourages" makes

---

[7]     The subdivision states: "(b) Purpose (1) This rule is intended to: [¶] . . . [¶]  (B) Encourage courts hearing cases involving child custody and visitation to take every action practicable to ensure that they are aware of the existence of any criminal court

this rule mandatory or that the failure to follow it constitutes reversible error.

In her reply brief to father, though, she goes one step further and misrepresents what her authority purportedly says: "Juvenile courts must determine the existence of any active protective orders before issuing custody orders. (Cal. Rules of Court, rule 5.445(b)(1)(B)." We have quoted the rule in the margin. It says no such thing. The rule does not establish grounds for reversible error; it is an exhortation that various departments of a superior court work together to ensure that all courts have access to any protective order relevant to impending custody and visitation orders.[8]

---

protective orders involving the parties to the action currently before them." (Cal. Rules of Court, rule 5.445(b)(1)(B).)

[8] In addition to encouraging communication among courts, Rule 5.445 directs superior courts to adopt local rules establishing "[a] procedure requiring courts issuing any orders involving child custody or visitation to make reasonable efforts to determine whether there exists a criminal court protective order that involves any party to the action." (Cal. Rules of Court, rule 5.445(c)(1)(A).) The Los Angeles Superior Court has adopted such a local rule. (Super. Ct. L.A. County, Local Rules, rule 2.30, former rule 8.34.) That rule states that "[b]efore issuing . . . a custody or visitation order, the judicial officer should inquire of the parties and the attorneys whether the court has any cases in which there are criminal or civil protective orders . . . that involve the child of the parties in the current case." (*Id.*, rule 2.30(b)(1).)

Mother does not cite Local Rule 2.30, but in any event, the rule does not create grounds for reversible error. The record also shows that there were inquiries about the protective order. In December 2023, father told the department that "there are no restraining orders in effect," and, as discussed in the text, mother

Beyond the misrepresentation of the court rule, mother's argument reveals fundamental misperceptions about the role of the court and counsel in trial proceedings and of the appellate process. It is uncontested that at one time the criminal court had issued a CPO against father and for the benefit of mother. It included no-contact and stay-away orders protecting mother, her house, and her vehicle. The order did not include child. The CPO itself was part of the dependency court record. There appears some inconsistency on how the order terminates. In one place, the CPO states both that the "order remains in effect until further court order" and that courts "must" use another specified court form to terminate the order. Three pages later it states that pretrial orders (like the CPO here) are only "valid as long as the court has jurisdiction over the case." Mother did not furnish a record of father's probation terms and conditions or information about whether he was still on probation. Nor did she provide any other documents from the criminal court file that could have had a bearing on the status of the CPO at the time of the final juvenile court hearing. According to the department, despite its urging, mother did not seek a permanent restraining order earlier in the case.

---

and the court had a brief exchange on the subject at the July 10, 2024, hearing. Mother did not ask to continue that hearing so she could review the criminal court file or provide the dependency court with any additional available information.

Mother also made no argument at the final jurisdiction hearing that the court's decision on joint custody should be influenced by whether the CPO was or was not in effect. The court and counsel had a brief exchange about whether father was still bound by the CPO, but not about the significance of a finding on that question on any award of legal custody. Mother's counsel made no mention of the CPO whatsoever until the court asked whether father was still subject to the order. Mother's counsel said she was unsure. The court stated, "I don't think so," and that was it. Mother did not argue that the prior issuance of a protective order supported her argument against joint custody. She did not ask for the court's assistance in determining whether father was still subject to the CPO. Nor did she ask the court to make a finding about the protective order. She has thus waived her argument. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.)

The juvenile court committed no error concerning the existence or nonexistence of the protective order or any impact the order might have had on the award of joint legal custody.[9]

---

[9] To the extent mother argues separately that circumstances that led to dependency jurisdiction had not sufficiently abated to terminate jurisdiction, that argument is waived. (*In re Dakota H., supra,* 132 Cal.App.4th at pp. 221-222; *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707, fn. 4 [issues not raised in opening brief waived].) Mother did not object below to terminating dependency jurisdiction and waited until her reply briefs to mention the statutory presumption that failure to comply with a case plan establishes a prima facie case that jurisdiction should not terminate under Welfare and Institutions Code section 364, subdivision (c).

## DISPOSITION

The order awarding joint legal custody to mother and father is affirmed.

                                        RUBIN, J.*

We Concur:


        STRATTON, P. J.



        VIRAMONTES, J.

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.